# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 4, 2016

## IN RE HAILEY S.

**Appeal from the Circuit Court for Macon County**
**No. 2014CV87      Clara W. Byrd, Judge**

_____

**No. M2016-00387-COA-R3-JV – Filed December 5, 2016**

_____

This appeal arises from an adjudication of dependency and neglect against the father of a child born out of wedlock and a denial of an intervening petition for custody filed by the father's relatives. The father and intervening petitioners appeal the circuit court's decision. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY ARMSTRONG, J., joined.

Connie Reguli, Brentwood, Tennessee, for the appellants, Matthew S. M., Bobbi DuBoise, and Will DuBoise.

Herbert H. Slatery, III, Attorney General and Reporter, Andree S. Blumstein, Solicitor General, and Kathryn A. Baker, Asst. Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Lisa C. Cothron, Lafayette, Tennessee, Guardian ad Litem.

## OPINION

### I. BACKGROUND

Hailey Ann S. ("the Child" or "Hailey") was born out of wedlock on August 8, 2012, to Aren S. ("Mother") and Matthew S. M. ("Father") in Johnson City, Tennessee. Mother

and Father attended the same high school in Michigan and met in 2011 during a drug exchange. When Mother became pregnant, she moved to Tennessee to live with her mother, Michelle S. Father saw Mother on three occasions after she moved; he then dropped out of school and came to Tennessee in February 2012. The two argued about Mother's drug use, and they broke up two to three weeks later. At the time of the Child's birth in August 2012, Father returned to Tennessee and stayed with Mother in the hospital for four to five days before returning to Michigan. Father signed an acknowledgment of paternity two days after Hailey's birth, and her birth certificate bears his name. *See* Tenn. Code Ann. § 24-7-113. However, Father later testified that when he signed the acknowledgment of paternity, he thought he was giving guardianship rights to Michelle S., Mother's parent. Father was never the custodial parent of Hailey, he never had any regular structured parenting time, and he never established a financial relationship with the Child.

Over the following months, Father saw Hailey on two to three occasions. After Mother refused to allow him to see the Child, on March 27, 2013, seven months after Hailey's birth, Father filed a petition for visitation in Sumner County.[1] His handwritten petition sought visitation in order for him to have a relationship with his daughter. He later claimed that he knew of no drug use by Mother at that time. Before a hearing could be held on Father's request for visitation, the Tennessee Department of Children's Services ("DCS") removed Hailey from Mother's custody.[2]

On June 21 and 22, 2013, when the Child was ten months old, Mother attended a party where drugs were in use. Mother later admitted to DCS to ingesting 23 Klonopin pills and 8 Valium pills, along with smoking half a joint of marijuana. Hailey was left without proper supervision at the party and suffered physical abuse. Mother informed interviewers that "Matthew Marble" was Hailey's father but did not provide DCS contact information for him. After DCS determined that there was no less drastic alternative than removal of the Child from Mother, who was still a minor herself, temporary legal custody of Hailey was awarded to the state by the juvenile court. DCS's petition alleged that Father was "unknown in the power of attorney" provided by Mother. No allegations were made against Father at that time.

On June 23, 2013, Hailey was placed in the foster home of Dana D. ("Foster Mother") and Brandon G. ("Foster Father") (collectively, "Foster Parents"). When Foster Parents took her in, the Child exhibited bite marks and bruises on her face, scabs under her eye, and bruising on her stomach and feet. Foster Parents observed that Hailey did not want to be held

---

[1] The case originated in Sumner County but was transferred to Macon County in July 2013, upon the request of DCS.

[2] Mother surrendered her parental rights to Hailey in September 2014 and is no longer a party to the litigation involving the Child.

and did not make eye contact; she cried and could not be soothed.

Shortly after the Child's placement with Foster Parents, she was examined by a pediatric neurologist, Dr. Marcos Cruz. An MRI revealed a micro-hemorrhage in the Child's brain due to trauma. Consistent with such trauma, her gross and fine motor functions were affected by weakness on her left side (hemiparesis). Dr. Cruz diagnosed Hailey with cerebral palsy--a brain injury before the age of one. Other diagnoses for the Child included epilepsy, cortical vision impairment, fetal alcohol spectrum disorder, ADHD, drug exposure in utero, and autism spectrum disorder. Around the same time, Hailey received an evaluation from Tennessee Early Intervention System ("TEIS") and began developmental therapy with Rainbow Early Intervention.

About eight or nine days after Hailey was removed from Mother's custody, DCS finally made contact with Father in Michigan. Interviews with Father revealed some past drug use on his part and a seizure disorder. However, he had not experienced any seizures in over a year and was not on medication. Father admitted that he lived with his grandmother and did not have a way to support himself or the Child. The Interstate Compact on the Placement of Children ("ICPC") was discussed with Father and his mother during these beginning conversations. *See* Tenn. Code Ann. §§ 37-4-201 to -207.

When a child enters foster care, Tennessee law requires the development of a plan of care. Within that plan are included parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). Initially, Father did not get involved in the permanency plan process, stating that he was advised not to participate. Despite his lack of involvement at that point, DCS mailed a copy of the permanency plan to Father, along with materials on parenting, employment, and communicating with children through play. Because of his lack of housing or means of support, it appears that DCS did not pursue Father as a placement for Hailey.

In September 2013, Father became involved in revising the permanency plan. Per the plan's requirements, he was expected to complete a mental health assessment and to follow the recommendations, pay child support, establish and maintain a home and a legal means of income through employment or public benefits, develop and maintain a relationship with Hailey, take a parenting class, and be further evaluated and receive clearance regarding his seizure disorder. He was also required to submit child support. In an effort to assist Father, the caseworker and supervisor at DCS provided their contact information, helped him determine if he had insurance coverage for mental health and alcohol and drug ("A&D") treatment, attempted to set up mental health services for him, searched for Michigan resources and provided this information to Father, attempted to set up appointments for him in Michigan, arranged visitation, offered and paid for transportation and lodging for Father, kept in touch with him, provided redirection during and reports about visitation, paid for paternity testing and explained the results, paid for Father's mental health and A&D

assessment and explained the results, and provided therapeutic visitation.

Early in September 2013, DCS filed an amended petition alleging that Hailey was dependent and neglected as to Father because he had failed to file a petition to legitimate the Child and had failed to protect her from Mother's drug use. On October 3, 2013, the results of DNA testing were filed, revealing that Father indeed was the biological father of the Child.

Around this time, Father and his mother approached his aunt and uncle, Will and Bobbi DuBoise, about being a possible placement for Hailey. The DuBoises live in Michigan, approximately 20 to 30 minutes from Father. Upon learning of the ICPC process, Ms. DuBoise immediately began pursuing foster care licensure in Michigan. By November 2013, Ms. DuBoise was attending DCS's foster care review board meetings, began traveling regularly to Tennessee with Father to visit with Hailey, and contacted Michigan doctors in preparation for having the Child in their home. DCS initiated the ICPC process for both Father and the DuBoises (collectively, "Appellants") and submitted requests to Michigan in January 2014. During the ICPC investigative process, Father related that his relationship with Mother ended because he "was angry with her that she was continuing to do drugs while she was pregnant." He also stated that "it took him awhile to learn it was better to just send the items that Hailey needed versus the money because [Mother] used the money for drugs and other things." The Michigan investigator denied Father's ICPC request because he could not support himself or Hailey and was reliant upon his grandmother for housing.

Meanwhile, Father completed a mental health and A&D assessment in Tennessee in February 2014. The counselor, Jerri Cross, noted that Father displayed some cognitive distortion and memory issues. During the assessment, Father mentioned a "dark time" which he refused to discuss. He was diagnosed with Post Traumatic Stress Disorder ("PTSD") and Depressive Disorder Not Otherwise Specified. He received two "rule-out" diagnoses of Pervasive Developmental Disorder (Asperger's) and Cognitive Learning Disorder – these diagnoses required that Father be observed over time for further assessment. The counselor recommended that Father attend individual counseling to address his PTSD, depressive symptoms, and past history of trauma; that he obtain a mental health medication management assessment to determine if he needed medication; that he complete parenting education; that he be involved in Hailey's therapies to learn about her needs; and that he continue with his plans of obtaining his GED and employment.[3]

---

[3]Father has pinguecula, an accumulation of connective tissue that thickens the conjunctiva. *Steadman's Medical Dictionary* (27th ed.) at 1385. According to Father, he is legally blind in one eye. He has been diagnosed with ADHD and was previously on medication. Father also claims to "suffer[] from cognitive and development[al] delays such that it creates a substantial limitation on his major life activities." *Marble v. State*, No. 3-15-0508 (M.D. Tenn.).

Between 2010 and 2015, Father was seen by a Michigan therapist of his choosing intermittently on seven occasions. In December 2013, Father approached the therapist requesting a letter to prove that he was not a risk to Hailey. Because he had not seen Father for a period of time, the therapist explained that he could not provide such a letter. He discussed various options and recommended an independent personality assessment. According to the therapist, Father expressed no interest. He referred Father to Behavioral Health Resources, but the therapist did not know if Father had followed up. The therapist testified that in 2014, Father told him that "he really didn't want anything from treatment other than to meet the [DCS] requirements." In March 2015, the therapist reported to DCS that Father had a bad attitude toward counseling: "Father 'blames Tennessee and takes zero responsibility for his child being in custody. [Father] is focusing on how to fight the system instead of work with the system.'"

As to the other aspects of the permanency plan, when Father was asked by DCS if he needed assistance with anything, he declined all help. The record does reveal that Father attended parenting classes through Fatherhood Connections in Michigan, signed medical release forms, and submitted to random drug screens. He did not remit child support.

Meanwhile, the DuBoises' ICPC request was ultimately approved, effective April 9, 2014, and DCS moved in July 2014 to place Hailey with the couple for a trial home placement. However, on August 1, 2014, the Child's then guardian ad litem filed an objection. She complained that a new home study was needed because additional foster children had been accepted into the DuBoise home. She also contended that the Child's best interests were not served by her removal to Michigan, noting Hailey's medical condition and that Mother was still entitled to visitation in Tennessee at least twice monthly at that time. Mother also expressed her disagreement with the placement. After a hearing on August 8, 2014, the court denied the trial home placement motion, finding "that it [was] not in the best interest of the [C]hild to be placed in Michigan." The DuBoises filed an intervening petition for custody and a motion to intervene in the juvenile court on August 12, 2014.

DCS filed a petition to terminate Father's parental rights on September 18, 2014, alleging that termination was supported by the statutory grounds of (1) abandonment for failure to remit support, (2) substantial noncompliance with the permanency plans, and (3) the persistence of conditions which led to removal. For some reason, Father stipulated to dependency and neglect in the juvenile court proceeding due to his failure to legitimate Hailey; he also admitted to lack of stable housing. After the juvenile court adjudicated Hailey dependent and neglected on September 29, 2014, and denied the DuBoises' motion to intervene, Appellants appealed to the circuit court. The court then denied their motion to continue the termination proceeding, finding that the termination proceeding was an independent action.

On April 21, 2015, the first day of the circuit court's de novo review of the

dependency and neglect finding, Appellants moved to dismiss the September 2013 petition, since Father was Hailey's legal parent and DCS had informed counsel that it was not proceeding under a theory of severe abuse. DCS does not deny that it had declared that it did not intend to pursue a severe abuse finding against Father. However, the circuit court granted DCS leave to amend its petition. When the hearing resumed on May 5, 2015, DCS filed its second amended petition, in which it asserted that the Child was dependent and neglected as to Father who "failed to protect his child from the drug use by the mother." DCS also contended that Father had "admitted in court . . . that he cannot care independently for his child."

Father argued that his due process rights of notice and opportunity to be heard were violated by the court's allowance of the amended petition. However, he failed to establish that he was harmed by the amendment. One reason for allowing the amendment was to include a statement that Father made on the first day of trial in which he admitted that he could not care for the Child. Also, the bulk of the testimony and evidence was not taken until eight months after DCS filed the amended petition. By the time the trial resumed on January 12, 2016, Appellants had notice of what the petition included and enough time to prepare Father's defense. *See Northeast Knox Utility Dist. v. Standfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006). Thus, the court did not abuse its discretion when it allowed the amendment. *State, Dep't of Human Servs. v. Hauck*, 872 S.W.2d 916, 918-19 (Tenn. Ct. App. 1993) (citing *Derryberry v. Ledford*, 506 S.W.2d 152, 156 (Tenn. Ct. App. 1973)). The circuit court also was permitted to go beyond the dependency and neglect petition to make its own determination that Father committed severe abuse. Tennessee Code Annotated section 37-1-129(a)(2) provides: "If the petition alleged the child was dependent or neglected as defined in § 37-1-102(b)(12)(G), or *if the court so finds regardless of the grounds alleged in the petition*, the court shall determine whether the parents or either of them or another person who had custody of the child committed severe child abuse." (Emphasis added.). DCS had properly petitioned the court to find the Child dependent and neglected under the definition provided in Tennessee Code Annotated section 37-l-102(b)(12) and included facts about Hailey's status to demonstrate that she met the definition. The circuit court recited in its order part of the statutory definition of a dependent and neglected child and included subsection (b)(12)(G): a child who is suffering from abuse and neglect.

The circuit court trial spanned ten months: April 21 and May 5, 2015, and January 12 through 15, 2016. After the first two days of trial, the court entered a stay when DCS announced that Father's parental rights had been terminated in the separate proceeding on April 30, 2015, and that Father had sued DCS in federal court. Father's federal court action argued that parents with disabilities were entitled to greater flexibility from DCS. *See Marble v. State*, No. 3:15cv-0508 (M.D. Tenn.). Once Father's parental rights were terminated in April 2015, he was allowed no further contact with Hailey.

On November 16, 2015, the Tennessee Supreme Court granted Appellants'

application for extraordinary appeal under Rule 10 of the Tennessee Rules of Appellate Procedure, vacated the stay, and remanded the case to the circuit court with instructions to finish conducting the dependency and neglect appeal. Thereafter, the circuit court decided that the DuBoises would be heard on the issue of whether they should be a placement for Hailey.

In December 2015, Father suffered his first seizure in three years. Although he had been medically cleared to obtain a driver's license in October 2013, he had not yet obtained one. At trial, Ms. DuBoise opined that Father was afraid to drive, fearful of the onset of a seizure. Father also had not completed his GED, despite working on it for about two years. He had not been able to find a job he could keep and did not have a job or monthly income.

At trial, the court heard evidence regarding the ability of Father and the DuBoises to provide a home for the Child. Hailey's current situation with Foster Parents was also addressed. Further, the testimony reviewed Hailey's occupational and physical therapy; she had 37 therapy appointments per month, some at home and others at daycare. Her physical therapist testified that Father and the DuBoises had not attended any appointments with him since he started working with Hailey in January 2014. The record revealed that Father attended one physical therapy appointment with a prior therapist (September 17, 2013) and one well-check medical visit (August 8, 2014). The physical therapist related that it was important for Hailey's caregivers to be involved in working with her and to be knowledgeable about her needs because the daily home exercise program prevented regression. Foster Mother had attended most therapy sessions. According to Foster Parents, car trips of more than 30 to 45 minutes would cause the Child to vomit. Also, the Child was prone to "sensory meltdowns"--screaming, throwing herself on the ground, and shaking. To prevent these episodes, Hailey, very routine oriented, participated in sensory input activities every two hours. The neurologist stated that the most important factor in Hailey's health was the day-to-day care she received, and he described the Child's current care as excellent. Hailey also visited multiple doctors on a regular basis: the orthopedist every two months, the dentist every six months, the neurologist every three months, the ophthalmologist every two months, the developmental pediatrician as needed, the psychiatrist twice per month, and her primary care physician at least once per month.

The record revealed that Father visited Hailey on a monthly basis, often with the DuBoises. Foster Parents supervised some visitation until DCS provided therapeutic visitation in 2014. Ms. DuBoise, while admitting that Father had a lot to learn, believed that her nephew did a great job playing with Hailey and had the potential to be a good father. However, Foster Mother opined that Father was sometimes inappropriate at visits because he needed additional parenting education on changing diapers, proper interaction, proper feeding, and addressing Hailey's sensory input needs. At one visitation, the Child fell off a bench because Father did not support her back. He also taught Hailey to stick her tongue out at people. According to Foster Mother, after visits, Hailey would lick furniture, rock, shake,

clench her fists, bang her head, kick, and bite herself because she was not on her normal sensory input schedule. She recalled emailing Father in January 2015 to let him know that Hailey had experienced a seizure and that there was an upcoming TEIS meeting; Father, without expressing concern or asking any questions about Hailey's condition, responded that he could not make the TEIS meeting.

Foster Father testified that after visitation, Father would not clean up the meeting area until his family helped him. He recalled Father arguing with the Child on the telephone in January 2015 to call him "daddy" and not "Matt." Foster Father further noted that Hailey would become agitated after phone calls with Father when she had been corrected. Once, after a phone call with Father in February 2015, the Child took off all of her clothes and urinated on the floor. The guardian ad litem described Father as "unfit to properly care for Hailey due to mental incapacity."

Mr. DuBoise asserted to the court that "family should stay with family" and that "[f]amily should help family." He observed that Hailey could receive all necessary therapies and medical treatment in Michigan. Father acknowledged that he was unable to independently care for Hailey and that he was reliant upon his family's assistance. He admitted that he was not asking for Hailey to be placed in his home because he knew that he could not provide for her financially or physically. Father indicated that he was asking "pretty much to still remain a parent and be able to be a father to my daughter and, you know, be able to support her financially when I'm on my feet."

As of the conclusion of the trial, Hailey was around three and a half years old and had lived with Foster Parents for 30 months--approximately two-thirds of her life. The Child had never lived with Father. The DCS caseworker, Lindsay Kenyon, initially supported placing Hailey with the DuBoises in August 2014, but by January 2016, she believed that it was in the Child's best interest to remain with Foster Parents, whom Hailey referred to as "daddy" and "mommy." Ms. Kenyon opined that Hailey would be traumatized if she were removed. DCS further noted that the Child was well cared for and happy with Foster Parents, who were financially secure and willing to adopt Hailey if that proved to be an option.

After hearing all the testimony and proof, the circuit court concluded that Hailey was "dependent and neglected within the meaning of the law." The court found that Father was unable to provide for [the Child] physically, emotionally, and financially," and that Father himself "has determined that he is not able to parent his child." The court observed that "in the 2 and 1/2 years that this case has been pending [Father] has made no progress. He still lives in Michigan with his father and grandmother; he still has no driver's license; he still does not have his GED; and he still does not support himself." The court specifically ruled as follows:

> [T]here is no reason he can't provide. The testimony has been

that he's not able to keep a job, but he does not have any disability that prevents him from working. He doesn't have a disability that prevents him from finishing his GED or from finishing his education. He doesn't have a disability that prevents him from passing a test and driving.

Additionally, having found that the Child had multiple medical issues, the court concluded that "Hailey would be subject to an immediate threat to her safety if she were in the hands of her father."

The court further determined that Hailey was "a victim of severe child abuse perpetrated by [Father] because he knowingly failed to protect the child from the abuse." The court found that "[Father] absolutely knew [Mother] had a drug history and was doing drugs when he came to Tennessee. He saw her. He argued with her. He knew it was not safe for the Child to ever be with a mother who was doing drugs. Father failed to protect the Child when he knew she was in harm's way by virtue of this mother."

In regard to the DuBoises, the court noted that they "sound like excellent parents and excellent foster parents" but explained that it "ha[d] to consider what is in the best interests of Hailey." The court stated,

> "[T]he problem in this case" was that Father lived in Michigan; Mother had moved to Tennessee before Hailey was born; Hailey was severely abused, and DCS needed to remove her from Mother's custody; Mother did not know where Father was at the time; DCS did not know about the DuBoises at the time; and thus Hailey was placed in a foster home, which was "an excellent foster home." After that, while DCS worked toward reunification, "time passed": Approximately 2 and 1/2 years have passed and Hailey has bonded with Foster Parents and their children. We know that if she stays in her current placement she will continue to progress.

Appellants' counsel argued that the DuBoises were "punish[ed] for time . . . [a]nd it [was] not their fault." They were "diligent," "pursued it," and did "everything they could." Both Father and the DuBoises filed timely appeals from the circuit court's order. On May 31, 2016, this court affirmed the termination of Father's parental rights; Father filed a petition to rehear, which was denied on July 1, 2016. *See In re Hailey S.,* No. M2015-00842-COA-R3-PT, 2016 WL 3209444 (Tenn. Ct. App. May 31, 2016).

## II. ISSUES

The issues raised in this appeal by Appellants are restated as follows:

1. The trial court erred in finding that the Child is dependent and neglected as to Father.

2. The trial court erred in finding that Father had committed severe abuse for failure to protect.

3. The trial court erred in placing custody of the Child with DCS instead of placing custody with the relatives.

4. The state failed to make reasonable efforts for maintaining the parental rights of Father. The state is collaterally estopped from denying Father's disability and therefore, the Americans with Disabilities Act applies, notwithstanding the court's finding that Father was not disabled.

5. The obstruction of a timely adjudication of this matter was prejudicial to the rights of Father and the intervening petitioners.

## III. STANDARD OF REVIEW

We review the trial court's findings of fact de novo, accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re D.Y.H.*, 226 S.W.3d 327, 329 (Tenn. 2007). As we discussed in *In re: H.A.L.*:

> Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.

*In re: H.A.L.,* No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *4, n. 10 (Tenn. Ct. App. Apr. 25, 2005). We review conclusions of law de novo without a presumption of correctness. *In re D.Y.H*, 226 S.W. 3d at 329.

A child's status as dependent and neglected must be proven by clear and convincing

- 10 -

evidence. Tenn. Code Ann. § 37-1-129(c)(2014); *see In re S.J.,* 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012); *In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *7 (Tenn. Ct. App. July 23, 2007). A finding of severe child abuse must also be established by clear and convincing evidence. Such evidence eliminates any real doubt about the correctness of the conclusions drawn from the evidence." *In re Isaiah L.,* 340 S.W.3d 692, 705 (Tenn. Ct. App. 2010).

## IV. DISCUSSION

### A.

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). As our Supreme Court recognized in *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999):

> Both the United States and Tennessee Constitutions protect a parent's right to the custody and upbringing of his or her child. . . . [T]he United States Supreme Court held that an unwed father was entitled, as a matter of due process, to a hearing on his fitness as a parent before his children were taken from him. The Supreme Court has also emphasized that *unwed fathers must seize upon the opportunity to shoulder significant responsibility for the child's rearing before due process rights are implicated.* Once that opportunity has been seized, the child may not be removed in the absence of a finding of parental unfitness.

*In re Swanson*, 2 S.W.3d at 187 (internal citations omitted)(emphasis added). The Tennessee Constitution "provides for a parental right to privacy to care for children without unwarranted state intervention unless there is a substantial danger of harm to the child [ ]." *Id.* (citing *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993)). However, while this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v. C.N.K.*, 154 S.W.3d 584, 589 (Tenn. Ct. App. 2004). The Tennessee legislature has established the situations in which the rights of the biological parent may be limited. *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). These limitations include circumstances in which a child is deemed to be dependent and neglected. *Id.* "Parents have a duty to provide, and children have a corresponding right to be provided with a safe environment, free from abuse and neglect." *In re H.L.F.*, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009).

The state, through its *parens patriae* power, has the duty to intervene and protect a

child when the child's well-being is threatened. Tennessee Code Annotated section 37-1-102(b)(12) defines a dependent and neglected child as a child: ". . . (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for such child; . . . (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others; . . . ." After the de novo review, the circuit court found Hailey to be a dependent and neglected child under Tennessee Code Annotated section 37-1-102(b)(12)(B) & (F). The court additionally concluded that Hailey was a child who was suffering from abuse and neglect under subsection (b)(12)(G).

Father admitted in court that he could not care for the Child as he could not support her financially or physically. He had not been able to find a job that he could keep; he was not working and had no monthly income. In January 2016, when the circuit court trial concluded, Father claimed that his trips to Tennessee interfered with his ability to work and that he could not keep a job because he did not have his GED. However, the proof at trial revealed that Father came to Tennessee twice in one month only one time during the entire relevant time period. Further, Father did not yet have his GED despite working to obtain it for about two years. He testified that he was currently looking into getting SSI and disability benefits on the advice of his attorney, but he waited to apply for benefits until four to five months after the termination of parental rights trial. Father never completed the required mental health treatment and never applied for government housing. He did not attend the Child's medical or therapy appointments to learn how to care for her special needs. The court observed that Father "has significant limitations in his ability to comprehend" and "has issues," but has shown "no proof that he has any disability that keeps him from working." If Hailey were placed in Father's care, the evidence demonstrated that he would not be able to care for her. With these considerations in mind, we conclude that the court did not err in adjudicating Hailey as dependent and neglected under Tennessee Code Annotated section 37-1-102(b)(12)(B) & (F).

**B.**

The court found Hailey to be a victim of severe child abuse perpetrated by Father "because he knowingly failed to protect the child from the abuse." Severe child abuse is defined as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> . . . .

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Tenn. Code Ann. § 37-1-102(b)(21)(A) & (B). The definition expressly contemplates that knowing failure to protect from severe abuse is itself severe abuse.

"Knowing" includes when a person has actual knowledge of the relevant facts and circumstances and when a person is in deliberate ignorance or reckless disregard of the information presented to him. *In re Caleb J. B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010); *In re R.C.P.,* M2003-0l143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). Accordingly, the "knowing" standard is met when a parent is present during the abuse but fails to intervene and when a parent is "presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probably that severe child abuse would occur." Further, prenatal drug use constitutes severe child abuse under Tennessee Code Annotated section 37-1-102(b)(21); *In re Benjamin M.*, 310 S.W.3d 844, 847-51 (Tenn. Ct. App. 2009).

As argued by DCS, Father knew that Mother was using drugs when he saw her in Tennessee while she was pregnant with Hailey. He argued with her about it and eventually broke up with her because of it. Father acknowledged sending in-kind gifts to Mother while she was pregnant instead of money because he knew she was using the money for drugs. Despite knowing that Mother continued to use drugs while she was pregnant with Hailey, Father did not attempt legal intervention during the pregnancy. Additionally, he failed to attempt to obtain custody of the Child after she was born and prior to her being abused. When he filed a visitation petition in March 2013, Father's reason was because he was upset that Mother was preventing him from seeing Hailey, not out of concern for the Child's well-being. Mother's prenatal drug use constituted severe child abuse, but Father's failure to intervene despite his knowledge of her drug use also constituted severe child abuse because he failed to protect the Child. The record further reveals that Father knew Mother participated in a drug rehabilitation program at some point. The evidence clearly and convincingly supports the finding of the circuit court that Father failed to protect Hailey under Tennessee Code Annotated Section 37-1-102(b)(12)(G) & (21)(A) & (B).

Once a court determines that a child is dependent and neglected, it attempts to make the "disposition best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). The court may "permit the child to remain" with her parents, guardian, or other custodian; or transfer temporary legal custody to an individual "qualified to receive and care for the child" or to DCS. Tenn. Code Ann. § 37-1-130(a)(l) & (2). Appellants challenge the circuit court's determination that DCS should retain custody of Hailey. They argue that the court erred in not placing the Child in their custody.

Father did not seek custody of Hailey for himself, but sought to have her placed with the DuBoises. The circuit court recognized that the DuBoises appear to be good people but also that transferring Hailey to their care in January 2016 would be detrimental to the Child. Appellants appear to complain less about the circuit court's 2016 order and more regarding the issues surrounding when the juvenile court had jurisdiction of the case in 2014. They contend that DCS had a duty when the Child was taken into custody to perform a diligent search for the parents and relatives of the Child to see if there was an appropriate placement to maintain the family integrity. According to Appellants, DCS did not perform a diligent search, despite having the Child's birth certificate bearing Father's name. Appellants also argue that natural parents may be deprived the right of custody only upon a showing of substantial harm to the Child. According to Appellants, the State could not move to the best interest of the child analysis until it established that Hailey was dependent and neglected as it related to Father. Alternatively, they argue that the "best interests of the child" standard also requires "a balancing of the child's interest in preserving the parent-child relationship, an interest shared by the parents, against any competing interests of the child." *In re M.G.*, 407 N.W.2d 118, 121 (Minn. Ct. App. 1987).

Federal law requires that states give a preference to a relative over an unrelated prospective foster parent, provided that the relative satisfies the pertinent child protection standards. *See* 42 U.S.C.A. § 671(a)(19). However, the law mandates that "the child's health and safety shall be the paramount concern." Pub. L.No. 105-89, § 101(a)(A), 111 Stat. at 2116. Tennessee Code Annotated section 37-2-403(a)(1) and (d) note the preference for family placement in foster care. These code provisions apply to "placement immediately after removal from the home." *In re S.B.*, No. M1999-00140-COA-R3-CV, 2000 WL 575934 at *4 (Tenn. Ct. App. 2000). There is no preference for a relative after a child has been in foster care for an extended time. *See In re Adoption of A.K.S.R.*, 71 S.W.3d 715, 720 (2001).

As observed by the guardian ad litem, Father had no custody rights to Hailey at the time of the Child's injury and has never had such rights, as "absent an order of custody to the contrary, custody of a child born out of wedlock is with the mother." Tenn. Code Ann. § 36-2-303. A biological father who has signed an "acknowledgement of paternity" is declared the legal father with the obligation to pay support and the right to be given notice in the event

of litigation or attempted termination of parental rights/adoption. The acknowledgment does not vest any custody rights or visitation rights upon the legal father.

DCS contends that because Father never had custody of the Child and was not granted custody of Hailey by any court, the ICPC was applicable to him. Tenn. Code Ann. § 36-2-303. Only if Father were granted full and unfettered custody of Hailey would the ICPC not apply. Tenn. Code Ann. § 37-4-201, art. Ill (a); *see H.P. v. Dep't of Children and Families*, 838 So.2d 583, 585-86 (Fla. Dist. Ct. App. 2003) (holding the ICPC applicable to the placement of children with their nonresident mother where the trial court had retained jurisdiction "in order to monitor the father's performance under the case plan and consider whether future reunification was possible."). Accordingly, placing Hailey with Father in contravention of Michigan's denial of his ICPC would have violated the compact. Tenn. Code Ann.§ 37-4-201, art. IV.

When the court considered the Child's best interests at the relevant time of the de novo appeal, it decided that Hailey should remain with her foster family:

> While DCS was trying to reunite the child with the parents, time passed. This child was fortunate to have been placed in an excellent foster home. Approximately 2 and 1/2 years have passed and Hailey has been in the same foster home. She has bonded with the foster parents and their children. She has made so much progress in the foster home. She is already in multiple therapies in her community. If she were to go to Michigan she would have to obtain new services there and no one can say how long it would take to get those services. However, we know that if she stays in her current placement she will continue to progress.

In a de novo appeal, the circuit court must determine whether a child is dependent and neglected at the time it holds the trial and not at the time the juvenile court held trial. *See, e.g., In re Landon H.,* M2014-01608-COA-R3-JV, 2016 WL 762741, at *6 (Tenn. Ct. App. Feb. 25, 2016).

In *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), the Court addressed "evidence of substantial harm aris[ing] from the delay caused by the protracted litigation." The Court determined that "[e]vidence that [child] will be harmed from a change in custody because she has lived and bonded with the [foster family] cannot constitute the substantial harm required to prevent the parents from regaining custody." *Id.* at 812. The Court has further observed that it "previously rejected the contention that when a child has been in the custody of a non-parent for a significant period of time, a lesser standard may be applied in determining whether parental rights may be terminated. *In re Swanson*, 2 S.W.3d at 188 n.

- 15 -

In this case, the record supports the circuit court's decision. It would be adverse to the best interest of the Child to totally uproot her from the home she has known for most of her life. Hailey appears to be thriving in the foster home and has forged a parent-child bond with Foster Parents, referring to them as mommy and daddy. Dr. Cruz described Hailey's current care as excellent, and expressed the opinion that a new caregiver might be detrimental to the Child's recovery. Under the facts of this matter, Father did not have custody of Hailey for the first ten months of her life and visited with her only a few times. Unlike the situation in *In re Adoption of A.M.H.*, because neither Father nor the DuBoises had custody of the Child previously, there was no custody to regain. *Id.,* 215 S.W.3d at 812-13. Further, Father was not interested in parenting Hailey while receiving assistance in his own home; rather, he wanted the Child to live with the DuBoises while he lived elsewhere. The DuBoises sincerely believed that Hailey should live with them, but Ms. DuBoise agreed that Foster Parents had become part of Hailey's family, just as the children she had fostered were part of her family. Despite this acknowledgment, Appellants continued to focus on Father's ability to see Hailey, even if only a few times a month, in contrast to what was actually best for the Child. "A child's blood ties to a potential placement family do not override" consideration of what is best for the child. *See In re Isaiah R.*, 480 S.W.3d 535, 540 (Tenn. Ct. App. 2015). Where the interest of a child and the interest of an adult are in conflict, such conflict must be resolved in favor of the child. Tenn. Code Ann. § 36-1-101(d).

**D.**

Appellants argue that DCS did not make reasonable efforts to assist Father under Tennessee Code Annotated section 37-1-166(g) or the Americans with Disabilities Act ("ADA"), and that this failure is a defense to an adjudication of dependency and neglect. The ADA provides only that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. The circuit court found that Father was not a disabled individual under the ADA. Even assuming that Father was disabled under the ADA, he was not denied benefits or services--DCS assisted Father throughout the case. As the circuit court determined, DCS "did everything it could to get this child back to its parents." DCS is only required to make "reasonable efforts"; it cannot force parents who are uncooperative to participate. Under the facts of this case, Father did not "seize upon the opportunity to shoulder significant responsibility for the child's rearing." *See In re Swanson*, 2 S.W.3d at 187. Further, dependency and neglect proceedings determine the status of a child and are not a proceeding against a parent. *See State, Dep't. of Children's Servs. v. Huffines-Dalton*, No. M2008-01267-COA-R3-JV, 2009 WL 1684679, at *7 (Tenn. Ct. App. June 15, 2009). Any reasonable efforts made by DCS are not primarily for the parent's benefit; rather, "the child's

health and safety shall be the paramount concern." Tenn. Code Ann. § 37-1-166(g)(l). Accordingly, we agree with the circuit court that the ADA was not relevant to whether Hailey was dependent and neglected; neither Tennessee Code Annotated section 37-1-166 nor the ADA provides a defense to the adjudication of dependency and neglect.

### E.

Tennessee Code Annotated section 37-1-159(c) provides that when an appeal is perfected from the juvenile court in a dependency and neglect proceeding, the juvenile court record shall be delivered to the circuit court and that the de novo appeal in the circuit court shall be held within 45 days of receipt of the juvenile court's findings and reports. Appellants assert that this rule was violated in this case, that DCS was solely at fault for the delay, and that they were prejudiced as a result.

Tennessee Code Annotated section 37-1-159(c) does not provide a remedy for a court's failure to proceed within 45 days. *Cf.* Tenn. Code Ann. § 36-1-113(k) (providing that if a termination of parental rights hearing is not heard within six months, a party has "grounds to request that the court of appeals grant an order expediting the case at the trial level"). This court indicated in *In re Caleb* that an argument based on a violation of this statute has merit only if the party can show prejudice. 362 S.W.3d at 594.

"It is a general rule that statutory provisions which relate to mode or time of doing an act to which the statute applies are not held to be mandatory, but are held to be directory only, especially when there is no showing of prejudice to the one seeking to invoke the time limit." *In re Caleb*, 362 S.W.3d 581, 594 (Tenn. Ct. App. 2011) (quoting *State v. Guinn*, 02A01-9607-CV-00152, 1997 WL 15237, at. *2 (Tenn. Ct. App. Jan. 17, 1997)).

The juvenile court's final order was entered on January 20, 2015. The first hearing was held on April 21, 2015, after delays caused by an attorney's health and ice storms. Appellants admitted that these were "reasonable" delays. After learning on the second day of trial, May 5, 2015, that Father had sued the other parties and attorneys involved in the case, the circuit court stayed the appeal until ordered by the Supreme Court to proceed. "A trial court has broad discretion in the conduct of trials and the management of its docket." *Justice v. Sovran Bank,* 918S.W.2d 428, 429-30 (Tenn. Ct. App. 1995). We find no abuse of discretion under the circumstances herein presented. Therefore, failure to comply with the 45-day time provision did not require dismissal of the case due to prejudice.

## V. CONCLUSION

The judgment of the circuit court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of that court's judgment and for the collection of

costs assessed below. The costs of the appeal are assessed to the appellants, Matthew S. M. and Will and Bobbi DuBoise.

_____
JOHN W. MCCLARTY, JUDGE